**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAWN BALL,** | : | **Civil No. 1:11-CV-1829** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LT. BECKLEY, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.  Statement of Facts and of the Case

### A.  Dawn Marie Ball's Litigation History

In many ways, Dawn Ball's current circumstances inspire continuing sorrow and concern.  Dawn Ball is an inmate housed in the Restricted Housing Unit at the State Correctional Institution (SCI) Muncy, who by her own account suffers from a cascading array of severe mental illnesses, and who has candidly acknowledged that she is profoundly disturbed.  Ball v. Beard, No. 1:09-CV-845 (Doc. 42, pp.6-7.) Furthermore, Ball is also an inmate who has reported to the Court that she engages in multiple episodes of destructive, self-defeating and senseless behavior.

Much of this institutional misconduct is marked by disturbing, excretory behavior.  Indeed, a constant refrain throughout many of Ball's lawsuits is her

1

fascination with her own bodily wastes. For example, recurring themes in Ball's lawsuits include Ball's penchant for smearing feces on herself, her clothes, her property, and her cell, as well as her destruction of her own clothing, and her use of her clothing to plug her toilet and flood her cell with water and human waste. Ball is also, by her own admission, an inmate with a propensity for sudden, explosive rages, as illustrated by the civil complaint which she has filed <u>Ball v. Barr</u>, No.1:11-CV-2240 (M.D.Pa.). In this complaint, Ball describes an episode in which a discussion regarding the aesthetic qualities of a piece of cornbread escalated in a matter of moments into a profanity-laced wrestling match over a food tray.

Ball is a prodigious federal court litigant, bringing numerous lawsuits based upon her perception of the events that take place around her in prison. Indeed, at various times Ball has had more than 25 lawsuits pending before this Court.[1] Ball is

---

[1]<u>See, e.g.</u>, <u>Ball v. SCI Muncy</u>, No.1:08-CV-700 (M.D.Pa.); <u>Ball v. SCI-Muncy</u>, No. 1:08-CV-701 (M.D.Pa.); <u>Ball v. Hill</u>, No.1:09-CV-773 (M.D.Pa.); <u>Ball v. Beard</u>, No. 1:09-CV-845 (M.D.Pa.); <u>Ball v. Lamas</u>, No. 1:09-CV-846, (M.D. Pa.); <u>Ball v. Oden</u> , No 1:09-CV-847 (M.D.Pa.); <u>Ball v. Bower</u>, No. 1:10-CV-2561 (M.D.Pa.); <u>Ball v. Sisley</u>, No. 1:11-CV-877 (M.D.Pa.); <u>Ball v. Struther</u>, No. 1:11-CV-1265 (M.D.Pa.); <u>Ball v. Hummel</u>, No. 1:11-CV-1422 (M.D.Pa.); <u>Ball v. Beckley</u>, No. 1:11-CV-1829 (M.D.Pa.); <u>Ball v. Sipe</u>, No. 1:11-CV-1830 (M.D.Pa.); <u>Ball v. Craver</u>, No. 1:11-CV-1831 (M.D.Pa.); <u>Ball v. Powley</u>, No. 1:11-CV-1832 (M..D.Pa.); <u>Ball v. Cooper</u>, No. 1:11-CV-1833 (M.D.Pa.); <u>Ball v. Famiglio</u>, No. 1:11-CV-1834 (M.D.Pa.); <u>Ball v. Eckroth</u>, No. 1:11-CV-2238 (M.D.Pa.); <u>Ball v. Campbell</u>, No. 1:11-CV-2239 (M.D.Pa.); <u>Ball v Barr</u>, No. 1:11-CV-2240 (M.D.Pa.); <u>Ball v Giroux</u>, No. 1:12-CV-10 (M.D.Pa.); <u>Ball v Giroux</u>, No. 1:12-CV-11 (M.D.Pa.); <u>Ball v Curham</u>, No. 1:12-CV-12 (M.D.Pa.); <u>Ball v.</u>

also a prodigiously unsuccessful litigant, who has had numerous prior lawsuits dismissed either as frivolous, for failure to exhaust administrative remedies or on the grounds that the lawsuit failed to state a claim upon which relief could be granted. The history of repeated, frivolous and meritless litigation in federal court by this plaintiff has now led to court of appeals to conclude that Ball is barred as a frivolous filer under §1915(g)'s "three strikes" rule from proceeding *in forma pauperis* in federal court in the future. Ball v. Famiglio, 12-1067, 2013 WL 4038562 (3d Cir. Aug. 9, 2013).

## B.    Ball's Current Lawsuit

### 1.    Factual Background

It is against the backdrop of this history of unsuccessful, unexhausted and meritless filings that Ball instituted the current lawsuit on October 5, 2011. Ball's present lawsuit relates to an August 24, 2011, incident at SCI Muncy in which Ball was removed from her cell after failing to cooperate with staff who were attempting to provide her with medical care. In the course of this cell extraction, prison staff used OC spray to subdue and secure Ball. This OC spray use was approved by Ball's treating physician, Dr. Famiglio, after reviewing Ball's medical records and history.

---

Giroux, No. 1:12-CV-812 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-813 (M.D.Pa.); Ball v. Hummel, No. 1:12-CV-814 (M.D.Pa.); Ball v. D'Addio, No. 1:12-CV-815 (M.D.Pa.) .

In her complaint, Ball alleges, *inter alia*, that Dr. Famiglio's approval of this OC spray constituted cruel and unusual punishment which violated her rights under the Eighth Amendment to the United States Constitution. Like all inmates, Ball has a legal obligation to exhaust available administrative remedies before proceeding to federal court. In this case, Ball alleged in her complaint that she had submitted, but not fully exhausted, her administrative grievances prior to filing this lawsuit. (Id.)

With respect to these allegations, the undisputed facts can be simply stated:

## A.    Exhaustion of Grievances

The plaintiff, Dawn Ball is a state inmate who was housed at SCI Muncy in August of 2011. With respect to the matters set forth in this lawsuit, Ball has filed no administrative grievances regarding any of the allegations in her complaint concerning medical concerns relating to Dr. Famiglio arising from her asthma and the use of OC spray on August 2011. (Doc. 82, ¶20.) Ball was, however, fully familiar with Department of Corrections grievance procedures in August 2011, which required inmates to grieve dispute with prison officials, having filed numerous grievances in the past. (Doc. 82, ¶18.)

Specifically, pursuant to 37 Pa. C.S. § 93.9, the Department of Corrections maintains a grievance system, which is conducted in accordance with Administrative Directive DC-ADM 804, entitled "Inmate Grievance System." DC-ADM 804

establishes procedures for review of inmate grievances and consists of a three-step process. See Booth v. Churner, 206 F.3d 289, 293, n. 2 (3d Cir. 2000). This three-step process requires an inmate to file an initial grievance (Step One), an appeal to the Superintendent (Step Two), and a final appeal (Step Three) to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). To file an initial grievance, an inmate must submit to the Facility Grievance Coordinator a completed grievance form. Id. The inmate must specifically state any claims he or she wishes to make concerning violations of Department directives, regulations, court orders, or other law and state the relief sought. The grievance must be submitted within fifteen working days after the event in question. If the grievance is denied, the inmate may appeal within ten days to the Facility Manager. If the inmate is dissatisfied with the decision of the Facility Manager, she may then appeal to SOIGA within fifteen days of the Facility Manager's decision.

In this case, Ball signed and dated her civil complaint on October 3, 2011, only 42 days after this alleged incident, a period of time which would have been insufficient under Department of Corrections policies to have allowed Ball to complete all three mandatory steps of the prison grievance process. Moreover, prison records affirmatively reveal that Ball lodged multiple grievances during the time period embraced by this lawsuit, August 2011, contradicting her claim that she was

unable to file grievances. Specifically, Ball filed grievances on August 19, 24, 29, 2011, and each was appealed to final review. ( Doc. 83, Exs. 6-8, Documentation for Grievance Nos. 378068, 378048, 379141). Therefore, Ball had access to the grievance system throughout late August 2011. (Doc. 82, ¶¶ 21 and 22.)

## B. Medical Treatment

As for Ball's complaints regarding her medical care, Ball alleged that Dr. Famiglio's decision to medically authorize the use of OC spray constituted deliberate indifference to her medical needs. However, the evidence reveals the following undisputed facts with respect to this claim: With regard to Ball's medical condition, Ball has a mild asthma condition but since she is predominantly housed in segregation, she is not exposed to hazardous environmental elements. (Id., ¶7.) Ball's asthma is largely asymptomatic; she has not had a reported or witnessed asthma attack since her incarceration several years ago. (Id., ¶8.) Nonetheless, Ball has available to her emergency medical care within minutes and regular medical care on a daily basis should she need to be seen. (Id., ¶9.)

In fact, the episode which gives rise to the lawsuit arose out of staff efforts to provide medical care to Ball. On August 23, 2011, Ball was admitted to the infirmary where she received IV fluids due to a sacral gluteal abscess. (Doc. 83, Ex. 3, Physician Orders; Ex. 4, Progress Notes). The next morning, August 24, 2011, Dr.

6

Famiglio noted that she was improving and took steps to discharge her back to RHU with prescriptions for pain medications. (Id., Ex. 3, Physician Orders, Ex. 4, Progress Notes). Later that day, August 24, 2011, at 4:45 p.m., nursing staff noted that Ball was due to receive antibiotic and pain medications but that the door and windows were completely covered and she refused to speak to staff. (Id., Ex. 4, Progress Notes). At the next medication line on August 24, 2011, at 8:05 p.m., Ball again refused to answer direct orders to answer or uncover the door when medications were offered to her. (Id., Ex. 4, Progress Notes).

In light of Ball's recalcitrant behavior, at 8:35 p.m., on August 24, 2011, a three man compliance team assembled to remove Ball from her cell. (Id., Ex. 4, Progress Notes). As part of this process, prison staff used Oleoresin capsicum, also referred to as OC or pepper spray, to secure Ball's compliance. Dr. Famiglio cleared Ball for Oleoresin capsicum after balancing her mild medical conditions against institutional safety and security needs. (Id., Ex. 2, Declaration of Dr. Famiglio). These safety and security needs were triggered due to Ball's prior assaultive behaviors on institutional staff including kicking, spitting, throwing feces and bodily fluids on staff. (Id.). In addition, Ball has previously placed lubricants on the floor so that officers might slip and fall during cell extractions. (Id.).

Following Ball's August 24, 2011 cell extraction, she was promptly taken to a shower to clean off the spray and after coughing was administered a hand held inhaler as well as a nebulizer treatment, which was effective. (Id., Ex. 4, Progress Notes). In the early morning hours of August 25, 2011, nursing staff noted a report from RHU personnel that Ball was experiencing shortness of breath and administered two puffs of an albuterol inhaler to Ball, treatment which Ball indicated relieved her symptoms. (Id., Ex. 4, Progress Notes). At 11:30 a.m. on the following day, August 25, 2011, Ball was seen in sick call. Ball was alert and sitting on the floor with her mattress torn into pieces. Her respirations and oxygen rate were within normal limits and she was instructed to follow up with medical staff as needed. (Id., Ex. 4, Progress Notes).

## 2. Procedural History

On the basis of these uncontested facts, Dr. Famiglio moved for summary judgment in their favor on September 13, 2012. (Doc. 80.) After requesting an extension of time, which we granted, Ball responded to this motion on November 5, 2012. (Doc. 87.) Accordingly, this motion is now ripe for resolution. For the reasons set forth below, we recommend that the defendant's summary judgment motion be granted.

## II.    Discussion

### A.    Rule 56–The Legal Standard

Defendant Famiglio has moved for judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P., Rule 56. Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).  The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown

that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Moreover, a party who seeks to resist a summary judgment

motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n.2 (3d Cir. 2000), citing Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275, n.17 (3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. Henry v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)." [A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion

cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

## B.    The Prison Litigation Reform Act's Exhaustion Requirement

Defendant Famiglio first urges the Court to grant summary judgment on the plaintiff's claims because Ball failed to fully exhaust the administrative remedies available to her under Department of Corrections procedures.  In this case Ball's alleged failure to timely pursue these administrative remedies may have substantive significance for the plaintiff since the Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  Section 1997e's exhaustion requirement applies to a wide-range of inmate complaints, including damages complaints like those made by Ball grounded in alleged violations of the Eighth Amendment.  See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000). While this exhaustion requirement is not a jurisdictional bar to litigation, this requirement is strictly enforced by the courts.   This rigorous enforcement is mandated by a fundamental recognition that § 1997e's exhaustion requirement

13

promotes important public policies.  As the United States Court of Appeals for the

Third Circuit has noted:

> Courts have recognized myriad policy considerations in favor of exhaustion requirements.  They include (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process.  Each of these policies, which Congress seems to have had in mind in enacting the PLRA, is advanced by the across-the-board, mandatory exhaustion requirement in § 1997e(a). ... [A] a comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."  Moreover, "even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice" or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards.  And when a prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages.  In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring.  An across-the-board exhaustion requirement also promotes judicial efficiency. . . . Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto. . . .  In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained.  The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures.  All of these functions help courts navigate the sea

of prisoner litigation in a manner that affords a fair hearing to all claims.

Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000)(citations omitted).

Because of the important policies fostered by this exhaustion requirement, it has been held that there is no futility exception to § 1997e's exhaustion requirement. Id. Instead, courts have typically required across-the-board administrative exhaustion by inmate plaintiffs who seek to pursue claims in federal court.

Moreover, courts have also imposed a procedural default component on this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004). Applying this procedural default standard to § 1997e's exhaustion requirement, courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal court. See, e.g., Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter v. Beard, 183 F. App'x 178 (3d Cir. 2006).

Furthermore, applying this procedural default component to the exhaustion requirement, Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004), it has been held that:

As for the failure to the identify named defendants on the grievance form, . . . to the extent the identity of a defendant was "a fact relevant to the claim," Pennsylvania's prison grievance policy mandated that the identification be included in the inmate's statement of facts on the grievance form. And, . . . in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constituted a failure to properly exhaust his administrative remedies under the PLRA.

Williams v. Pennsylvania Dep't. of Corrections, 146 F. App'x 554, 557(3d Cir. 2005).[2] Thus, "it is clear, regardless of the purpose of the requirement, that Spruill requires the prisoner-grievant-plaintiff to name in the grievance those he eventually sues, upon pain of procedural default." Hemingway v. Ellers, No. 07-1764, 2008 WL 3540526, *11 (M.D.Pa. Aug.12, 2008).

This broad rule favoring full exhaustion admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only

_____

[2]While the Williams decision is not precedential, it is highly persuasive as a "paradigm of the legal analysis [this Court] should . . . follow." Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 n.12 (3d Cir. 1996). We find the reasoning in Williams compelling, and recommend that this reasoning be extended to the instant case.

be excused "under certain limited circumstances", <u>Harris v. Armstrong</u>, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." <u>Davis v. Warman</u>, <u>supra</u>, 49 F. App'x at 368. <u>See also</u> <u>Brown v. Croak</u>, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); <u>Camp v. Brennan</u>, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and uncontradicted correctional officers impeded filing of grievance).

Furthermore, it is entirely clear that the fact that Ball has in the past been under grievance restriction pursuant to DC-ADM 804, does not, by itself, excuse her failure to grieve this matter prior to filing suit in federal court, since those Corrections policies plainly allow inmates to file a limited number of grievances. Indeed, the United States Court of Appeals for the Third Circuit has rejected this precise argument in <u>Cummings v. Crumb</u>, 347 F. App'x 725, 727 (3d Cir. 2009), stating in that case that:

> [The inmate] also argued that he was denied the grievance process because he was on grievance restriction. According to the Pennsylvania Department of Corrections Grievance Policy DC-ADM 804 Part IV.L, an inmate on grievance restriction is restricted to filing no more than one grievance every 15 days. *Thus, being on grievance restriction would not have prevented [an inmate] from exhausting his remedies*.

Cummings v. Crumb, 347 F. App'x 725, 727 (3d Cir. 2009)(emphasis added).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005). Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Furthermore, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. Oliver v. Moore, 145 F. App'x

731 (3d Cir. 2005)(failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

Thus, in this setting, the Prison Litigation Reform Act requires that an inmate fully exhaust her administrative remedies before proceeding into federal court, an administrative exhaustion requirement which entails full compliance with state grievance procedures and timelines, as well as the basic requisite that the inmate identify those against whom she has a grievance during the administrative process before she may name these individuals as defendants in a federal lawsuit.

## C.     Ball Has Failed to Properly Exhaust Her Administrative Remedies

Judged against these guideposts, we find that defendant Famiglio is entitled to summary judgment in his favor on the grounds that Ball has failed to satisfy the PLRA's administrative exhaustion requirement.  In this case, with respect to the matters set forth in her complaint, it is entirely undisputed that Ball has never exhausted her administrative remedies.  Ball cannot claim she was unaware of this exhaustion requirement since it is clear that Ball was fully familiar with Department of Corrections grievance procedures in August 2011, having filed numerous grievances in the past, and Ball has previously had cases dismissed due to her failure to exhaust her administrative remedies.

Furthermore, we find that Ball has failed to carry her burden of proving "that there was some extraordinary reason [s]he was prevented from complying with the statutory mandate." Davis v. Warman, supra, 49 F. App'x at 368. Ball's bald assertion in her complaint that she was unable to file and exhaust a grievance, standing alone, plainly does not carry this burden of proof. In fact, Ball's ability to file such grievances is not simply a regulatory hypothetical; in this case Ball actually filed and fully exhausted grievances on August 19, 24, 29, 2011, and each was appealed to final review. (Doc. 83, Exs. 6-8, Documentation for Grievance Nos. 378068, 378048, 379141). Therefore, Ball had access to the grievance system throughout late August 2011. (Doc. 82, ¶¶ 21 and 22.)

Moreover, it is completely undisputed that Ball filed this lawsuit within 42 days of this incident a period of time which simply would not have permitted her to fully exhaust her administrative remedies. It is axiomatic that, for inmates, full exhaustion is legal prerequisite to filing a federal civil rights lawsuit, and inmate-plaintiffs like Ball may not avoid this requirement by simply commencing a grievance, and then filing a lawsuit prior to completion of the grievance process. Ahmed v. Dragovich, 297 F.3d 201, 209 n. 9 (3d Cir. 2002) citing Perez v. Wis. Dep't of Corr., 182 F.3d 532, 534–35 (7th Cir.1999) (observing "Congress could have written a statute making exhaustion a precondition to judgment, but it did not.

The actual statute makes exhaustion a precondition to *suit*"); Neal v. Goord, 267 F.3d 116, 122 (2d Cir.2001) (holding that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after filing her complaint in federal court). Accord Jackson v. District of Columbia, 254 F.3d 262, 269 (D.C.Cir.2001); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir.1999); Alexander v. Hawk, 159 F.3d 1321, 1328 (11th Cir.1998); Garrett v. Hawk, 127 F.3d 1263, 1265 (10th Cir.1997). Therefore, Ball's complaints about the timeliness with which prison staff attempted to address he bewildering array of grievances, do not provide her with a license to ignore of shortcut the grievance process, particularly in this case where Ball has not allowed the full grievance period to pass before she filed her lawsuit. Rather, on these facts, which are entirely undisputed, it is clear that Ball had ample opportunity to comply with the requirements of the PLRA by fully grieving these matters. Her failure to do so, therefore, compels dismissal of this case.

### C. Ball Has Failed To State an Eighth Amendment Deliberate Indifference Claim

Finally, Ball has alleged that an individual prison care-giver, Dr. Famiglio, displayed deliberate indifference to her medical needs in a fashion which constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Ball faces an exacting burden in advancing this Eighth

Amendment claim against prison medical staff in their individual capacities. To sustain such a claim, Ball must:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. "Deliberate indifference" is a subjective standard under Farmer-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).

By including a subjective intent component in this Eighth Amendment benchmark, the courts have held that a mere generalized knowledge that prisons are dangerous places does not give rise to an Eighth Amendment claim. See Jones v. Beard, 145 F. App'x 743 (3d Cir. 2005)(finding no Eighth Amendment violation where inmate-plaintiff complained about cellmate who had a history of psychological problems, but where plaintiff failed to articulate a specific threat of harm during the weeks prior to an attack.) In short, when "analyzing deliberate indifference, a court must determine whether the prison official 'acted or failed to act despite his knowledge of a substantial risk of serious harm.' Farmer v. Brennan, 511 U.S. 825, 841 (1994). A prisoner plaintiff must prove that the prison official 'knows of and disregards an excessive risk to inmate health or safety.' Id. at 837." Garvey v. Martinez, 08-2217,

2010 WL 569852, at *6 (M.D.Pa. Feb. 11, 2010).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 105 (1976). To establish a violation of his constitutional right to adequate medical care in accordance with this standard, Ball is required to allege facts that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997).

Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't

24

of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006); Bronson v. White, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); Gindraw v. Dendler, 967 F.Supp. 833 (E.D. Pa. 1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services.  Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his  . . . care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs.  "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . [The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care . . . . Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

James, 230 F.App'x. at 197-198.(citations omitted).

Furthermore, it is well-settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim.  See Taylor v. Norris, 36 F. App'x 228, 229 (8th Cir. 2002) (deliberate indifference claim failed when it boiled down to a disagreement over recommended treatment for hernias and decision not to schedule a doctor's appointment); Abdul-Wadood v. Nathan, 91 F.3d 1023, 1024-35 (7th Cir.1996) (inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); Sherrer v. Stephen, 50 F.3d 496, 497 (8th Cir.1994) (inmate's "desire for a replacement joint instead of fusion surgery is merely a disagreement with the course of medical treatment and does not state a constitutional claim"); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir.1990) (inmate failed to prove deliberate indifference where his complaints represented nothing more than mere disagreement with course of his medical treatment). Therefore, where a dispute in essence entails nothing more than a disagreement between an inmate and care-givers over matters of medical opinion, the inmate's complaint will fail as a constitutional claim; see e.g., Gause v. Diguglielmo, 339 F. App'x 132 (3d Cir. 2009)(dispute over choice of medication does not rise to the level of an Eighth Amendment violation); Innis v. Wilson, 334 F. App'x 454 (3d Cir. 2009)(same); Rozzelle v. Rossi, 307 F. App'x 640 (3d Cir. 2008)(same); Whooten

26

v. Bussanich, 248 F. App'x 324 (3d Cir. 2007)(same); Ascenzi v. Diaz, 247 F. App'x 390 (3d Cir. 2007)(same), since "the exercise . . . of . . . professional judgment is never deliberate indifference." Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997)(citations omitted).

Judged against these standards, Ball cannot sustain an Eighth Amendment deliberate indifference claim against Dr. Famiglio. Indeed, there is an irony to this claim since Ball's cell extraction occurred while she was undergoing medical care, and took place only after she refused to cooperate with medical staff. Thus, in this case it is entirely undisputed that the plaintiff was receiving on-going medical care from prison staff throughout August 23-25, 2011. Furthermore, given Ball's history of recalcitrant and violent behavior, a decision to use OC spray to gain her compliance was a reasonable, measured response to a security dilemma created by Ball. As such, this response did not violate the Eighth Amendment. See, e.g., Luciano v. Lindberg, 1:CV-09-01362, 2012 WL 1642466 (M.D. Pa. May 10, 2012) Picozzi v. Haulderman, Civ. No. 4:08–CV–0926, 2011 WL 830331, at *5 (M.D.Pa. Mar.3, 2011) (plaintiff failed to establish an excessive use of force claim where record establishes that the force used, pepper spray, was necessary and the minimum amount needed to get the plaintiff to an area where she could be medically treated); Soto v. Dickey, 744 F.2d 1260, 1270 (4th Cir.1984) ("The use of mace, tear gas or

other chemical agent of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment," even if the inmate is handcuffed).

Moreover, the undisputed evidence shows that Dr. Famiglio made the medical judgment that use of OC spray was appropriate in this case, only after taking into account the fact that Ball was a mild asthmatic who had been asymptomatic for a number of years. Further, following the use of the OC spray, Ball received prompt and appropriate medical care, which alleviated her discomfort and fully addressed her medical needs. Thus, in its present posture, Ball's Eighth Amendment claims should be dismissed since those: "[A]llegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to h[er] . . . care. . . . . Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts." James, 230 F.App'x. at 197-198.(citations omitted).

### D. Dr. Famiglio Is Entitled to Qualified Immunity

Finally, we find that, even if Ball had stated a colorable claim for any actions relating to her medical care on August 24, 2011, Dr. Famiglio would nevertheless be entitled to qualified immunity from these claims for damages. In order to

establish a civil rights claim Ball must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that Ball is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem,

499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. 231-32; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 236, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

In this case, case law has repeatedly rejected inmate Eighth Amendment challenges to medical care, finding no deliberate indifference to serious medical needs where it is shown that the prisoner received on-going care and treatment. See, e.g., Lasko v. Watts, 373 F.App'x 196, 203 (3d Cir. 2010); Hodge v. U.S.

Department of Justice, 2010 WL 1141387 (3d Cir. Aug. 2, 2010); Palmer v. Carroll, 640 F.Supp 2d. 542 (D.Del. 2009); Moshier v. United States, No. 05-180, 2007 WL 1703536 (W.D. Pa. June 11, 2007); Jordan v. Delaware, 433 F.Supp.2d. 433 (D.Del. 2006); Christy v. Robinson, 216 F.Supp.2d 398, 413 (D.N.J. 2002). Federal courts have also routinely held that medical disputes between physicians and prisoners over matters of medical opinion do not state an Eighth Amendment claim. See, e.g., Rodriguez v. Secretary Pennsylvania Dep't of Corrections, No. 10-3134, 2011 WL 3555424 (3d Cir. Aug. 12, 2011); Winslow v. Prison Heath Service, 406 F. App'x 671 (3d Cir. 2011); Guiddy v. Terhune, 90 F.App'x 592 (3d Cir. 2004). Finally, courts have consistently found that an isolated discrete use of OC spray does not state an Eighth Amendment claim. See, e,.g., Luciano v. Lindberg, 1:CV-09-01362, 2012 WL 1642466 (M.D. Pa. May 10, 2012) Picozzi v. Haulderman, Civ. No. 4:08–CV–0926, 2011 WL 830331, at *5 (M.D.Pa. Mar.3, 2011) (plaintiff failed to establish an excessive use of force claim where record establishes that the force used, pepper spray, was necessary and the minimum amount needed to get the plaintiff to an area where she could be medically treated); Soto v. Dickey, 744 F.2d 1260, 1270 (4th Cir.1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment," even if the inmate is handcuffed).

Given the state of the law in this field, which has consistently rebuffed inmate Eighth Amendment challenges like those presented here by Ball, Dr. Famiglio simply could not have recognized that his actions would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Therefore, Dr. Famiglio is entitled to qualified immunity on these claims.

## III. <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that defendant Famiglio's motion for summary judgment (Doc. 80.), be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall

witnesses or recommit the matter to the magistrate judge with instructions

Submitted this 28th day of August 2013.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge