**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAWN BALL,** | : | **Civil No. 1:11-CV-1829** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LT. BECKLEY, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.     Statement of Facts and of the Case

#### A.     Dawn Marie Ball's Litigation History

We are called upon in this case to reflect, once again, on a sad truth.

In many ways, Dawn Ball's current circumstances inspire continuing sorrow and concern.  Dawn Ball is an inmate housed in the Restricted Housing Unit at the State Correctional Institution (SCI) Muncy, who by her own account suffers from a cascading array of severe mental illnesses, and who has candidly acknowledged that she is profoundly disturbed.  Ball v. Beard, No. 1:09-CV-845 (Doc. 42, pp.6-7). Furthermore, Ball is also an inmate who has reported to the Court that she engages in multiple episodes of destructive, self-defeating and senseless behavior.

Much of this institutional misconduct is marked by disturbing, excretory behavior. Indeed, a constant refrain throughout many of Ball's lawsuits is her fascination with her own bodily wastes. For example, recurring themes in Ball's lawsuits include Ball's penchant for smearing feces on herself, her clothes, her property, and her cell, as well as her destruction of her own clothing, and her use of her clothing to plug her toilet and flood her cell with water and human waste. Ball is also, by her own admission, an inmate with a propensity for sudden, explosive rages, as illustrated by the civil complaint which she has filed Ball v. Barr, No.1:11-CV-2240 (M.D.Pa.). In this complaint, Ball describes an episode in which a discussion regarding the aesthetic qualities of a piece of cornbread escalated in a matter of moments into a profanity-laced wrestling match over a food tray.

In addition, Ball is a prodigious federal court litigant, bringing numerous lawsuits based upon her perception of the events that take place around her in prison. Indeed, at various times Ball has had more than 25 lawsuits pending before this Court.[1] Ball is also a prodigiously unsuccessful litigant, who has had numerous prior

---

[1]See, e.g., Ball v. SCI Muncy, No.1:08-CV-700 (M.D.Pa.); Ball v. SCI-Muncy, No. 1:08-CV-701 (M.D.Pa.); Ball v. Hill, No.1:09-CV-773 (M.D.Pa.); Ball v. Beard, No. 1:09-CV-845 (M.D.Pa.); Ball v. Lamas, No. 1:09-CV-846, (M.D. Pa.); Ball v. Oden , No 1:09-CV-847 (M.D.Pa.); Ball v. Bower, No. 1:10-CV-2561 (M.D.Pa.); Ball v. Sisley, No. 1:11-CV-877 (M.D.Pa.); Ball v. Struther, No. 1:11-CV-1265 (M.D.Pa.); Ball v. Hummel, No. 1:11-CV-1422 (M.D.Pa.); Ball v. Beckley, No. 1:11-CV-1829 (M.D.Pa.); Ball v. Sipe, No. 1:11-CV-1830

lawsuits dismissed either as frivolous, for failure to exhaust administrative remedies or on the grounds that the lawsuit failed to state a claim upon which relief could be granted. The history of repeated, frivolous and meritless litigation in federal court by this plaintiff has now led to court of appeals to conclude that Ball is barred as a frivolous filer under §1915(g)'s "three strikes" rule from proceeding *in forma pauperis* in federal court in the future. Ball v. Famiglio, 726 F.3d 448 (3d Cir. 2013).

## B.  Ball's Current Lawsuit

### 1.  Factual Background

It is against the backdrop of this history of unsuccessful, unexhausted and meritless filings that Ball instituted the current lawsuit on October 5, 2011. Ball's present lawsuit relates to an August 24, 2011, incident at SCI Muncy in which Ball was removed from her cell after failing to cooperate with staff who were attempting to provide her with medical care. In the course of this cell extraction, prison staff used OC spray to secure Ball. This OC spray use was approved by Ball's treating

---

(M.D.Pa.); Ball v. Craver, No. 1:11-CV-1831 (M.D.Pa.); Ball v. Powley, No. 1:11-CV-1832 (M..D.Pa.); Ball v. Cooper, No. 1:11-CV-1833 (M.D.Pa.); Ball v. Famiglio, No. 1:11-CV-1834 (M.D.Pa.); Ball v. Eckroth, No. 1:11-CV-2238 (M.D.Pa.); Ball v. Campbell, No. 1:11-CV-2239 (M.D.Pa.); Ball v Barr, No. 1:11-CV-2240 (M.D.Pa.); Ball v Giroux, No. 1:12-CV-10 (M.D.Pa.); Ball v Giroux, No. 1:12-CV-11 (M.D.Pa.); Ball v Curham, No. 1:12-CV-12 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-812 (M.D.Pa.); Ball v. Giroux, No. 1:12-CV-813 (M.D.Pa.); Ball v. Hummel, No. 1:12-CV-814 (M.D.Pa.); Ball v. D'Addio, No. 1:12-CV-815 (M.D.Pa.) .

physician, Dr. Famiglio, after reviewing Ball's medical records and history. In her complaint, Ball alleges, *inter alia*, that Dr. Famiglio's approval of this OC spray constituted cruel and unusual punishment which violated her rights under the Eighth Amendment to the United States Constitution. Ball also asserts that five corrections defendants– Deputy Superintendent Robert Smith, Captain Pauline Curham, Captain Jeff Karchner, Lt. Jason Beckley, and Sgt. Misty Cooper– participated in this use of excessive force against the plaintiff.

Like all inmates, Ball has a legal obligation to exhaust available administrative remedies before proceeding to federal court. In this case, Ball alleged in her complaint that she had submitted, but not fully exhausted, her administrative grievances prior to filing this lawsuit. (Id.) With respect to these allegations, the undisputed facts can be simply stated:

## A.  **Exhaustion of Grievances**

The plaintiff, Dawn Ball is a state inmate who was housed at SCI Muncy in August of 2011. Ball was fully familiar with Department of Corrections grievance procedures in August, 2011, which required inmates to grieve dispute with prison officials, having filed numerous grievances in the past.

Specifically, pursuant to 37 Pa. C.S. § 93.9, the Department of Corrections maintains a grievance system, which is conducted in accordance with Administrative

4

Directive DC-ADM 804, entitled "Inmate Grievance System." DC-ADM 804 establishes procedures for review of inmate grievances and consists of a three-step process. See Booth v. Churner, 206 F.3d 289, 293, n. 2 (3d Cir. 2000). This three-step process requires an inmate to file an initial grievance (Step One), an appeal to the Superintendent (Step Two), and a final appeal (Step Three) to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). To file an initial grievance, an inmate must submit to the Facility Grievance Coordinator a completed grievance form. Id. The inmate must specifically state any claims he or she wishes to make concerning violations of Department directives, regulations, court orders, or other law and state the relief sought. The grievance must be submitted within fifteen working days after the event in question. If the grievance is denied, the inmate may appeal within ten days to the Facility Manager. If the inmate is dissatisfied with the decision of the Facility Manager, she may then appeal to SOIGA within fifteen days of the Facility Manager's decision.

In this case, Ball signed and dated her civil complaint on October 3, 2011, only 42 days after this alleged incident, a period of time which would have been insufficient under Department of Corrections policies to have allowed Ball to complete all three mandatory steps of the prison grievance process. Moreover, prison records affirmatively reveal that Ball lodged 11 grievances between August 24 and

September 30, 2011, the time period embraced by this lawsuit, (Doc. 11, ¶¶24-25) , contradicting her claim that she was unable to file grievances at this time. Specifically, Ball filed grievances on August 19, 24, 29, 2011, and each was appealed to final review. ( Doc. 83, Exs. 6-8, Documentation for Grievance Nos. 378068, 378048, 379141) Therefore, Ball had access to the grievance system throughout late August 2011. (Doc. 82, ¶¶ 21 and 22)

Moreover, the undisputed evidence shows that Ball did not fully exhaust her administrative remedies with respect to these excessive force claims arising out of this August 24, 2011 cell extraction. Specifically, only 2 of the 11 grievances filed by Ball in August and September 2011 were in any way relevant to the pending claim involving a cell extraction and use of OC spray on August 24, 2011. (Id., ¶¶26-28.) Both grievances were denied at the institutional level and no appeals were taken by Ball. (Id.)

## B. Medical Treatment

As for Ball's complaints regarding this cell extraction, Ball alleged both that Dr. Famiglio's decision to medically authorize the use of OC spray constituted deliberate indifference to her medical needs, and that staff used excessive force in removing her from this cell. Ball neglected to note, however, that the cell extraction was videotaped by correctional staff. That videotape, in turn, reveals that several

aspects of Ball's claimed description of this cell extraction are visible fictions. For example, Ball has claimed that she was sprayed with OC on three occasions. This claim is contradicted by the video which reveals only one brief application of OC spray to Ball's cell through the cell aperture after Ball refused repeated requests to leave her cell peacefully. Similarly, Ball claimed to have vomited blood during this cell extraction, but this claim is also contradicted by the video evidence.

Instead, the evidence reveals the following undisputed facts with respect to this claim: With regard to Ball's medical condition, Ball has a mild asthma condition but since she is predominantly housed in segregation, she is not exposed to hazardous environmental elements. Ball's asthma is largely asymptomatic; she has not had a reported or witnessed asthma attack since her incarceration several years ago. Nonetheless, Ball has available to her emergency medical care within minutes and regular medical care on a daily basis should she need to be seen.

In fact, the episode which gives rise to the lawsuit arose out of staff efforts to provide medical care to Ball. On August 23, 2011, Ball was admitted to the infirmary where she received IV fluids due to a sacral gluteal abscess. (Doc. 83, Ex. 3, Physician Orders; Ex. 4, Progress Notes) The next morning, August 24, 2011, Dr. Famiglio noted that she was improving and took steps to discharge her back to RHU with prescriptions for pain medications. (<u>Id</u>., Ex. 3, Physician Orders, Ex. 4,

Progress Notes).  Later that day, August 24, 2011 at 4:45 p.m., nursing staff noted that Ball was due to receive antibiotic and pain medications but that the door and windows were completely covered and she refused to speak to staff.  (Id., Ex. 4, Progress Notes)  At the next medication line on August 24, 2011, at 8:05 p.m., Ball again refused to answer direct orders to answer or uncover the door when medications were offered to her.  (Id., Ex. 4, Progress Notes).

In light of Ball's recalcitrant behavior, at 8:35 p.m., on August 24, 2011, compliance team assembled to remove Ball from her cell.  (Id., Ex. 4, Progress Notes).  However, prior to this cell extraction prison supervisors took a series of prudent precautionary measures.  First, Captain Curham, who was the shift commander on duty, contacted medical staff for approval to use OC spray on Dawn Ball if necessary for a cell extraction.  (Doc. 111, ¶¶49-52.)  After being informed that Dr. Famiglio has cleared Ball for use of OC spray, Captain Curham then consulted with Deputy Superintendent Smith and conveyed to him the situation and that medical approved use of OC spray.  (Id.)  Following discussions between these two supervisors, Captain Curham received approval for this possible use of force and ordered Lt. Beckley to assemble staff and to proceed with the cell extraction.[2]

_____

[2]Ball has also named Captain Karchner as a defendant with respect to this August 24, 2011, incident but the undisputed evidence shows that Karchner was not on duty that day and played no role in these events. (Doc. 111, ¶53.) This was

The cell extraction video then reveals that a cell extraction team, accompanied by a nurse and Lt. Beckley was assembled to remove Ball from her cell. (Id., ¶¶54-71.) When staff arrived at Ball's cell, she had obscured the cell door window, making it impossible for staff to ascertain her movements, whereabouts in the cell or activities. (Id.) Ball has also stuffed bedding in the cell door aperture, in an apparent effort to prevent staff from inserting OC spray through the cell door to gain her compliance. (Id.)

At the cell door staff then engaged in a series of entreaties with Ball, asking Ball for several minutes to voluntarily exit her cell. (Id.) Receiving no response from Ball, staff removed the obstruction from the cell door aperture and applied a single, brief burst of OC spray to the cell. (Id.) Staff then entered the cell; placed Ball on the cell floor without incident; and applied restraints. (Id.)

Once Ball was in restraints, she was promptly taken to a nearby shower where staff assisted her in washing off any remaining OC spray. (Id.) Throughout this

a fatal shortcoming with respect to Ball's claims against this defendant since typically a defendant only "can be liable if they 'participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations.' A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir.2004) (second alteration in original)." Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir. 2010).

process staff handled Ball with care and self-restraint, encouraging her to take actions that would reduce her discomfort, aiding her, and taking care to minimize any pain or discomfort she might experience in this cell extraction. (<u>Id</u>.) Ball was also examined by nursing staff to ensure her health and safety. (<u>Id</u>.) At the conclusion of this process, Ball was placed in a second cell, with new bedding. (<u>Id.</u>)

### 2. Procedural History

On the basis of these uncontested facts, the corrections defendants moved for summary judgment in their favor on July 1, 2013. (Doc. 109) This motion was thoroughly supported by documentary and video evidence rebutting Ball's excessive force claims. (Docs. 110-130) After several months' delay, on November 19, 2013, Ball responded to this motion by filing a document styled as a motion to deny summary judgment motion (Docs. 141), and related pleadings. (Docs. 142-144) Accordingly, this motion is now ripe for resolution. For the reasons set forth below, we recommend that the defendants' summary judgment motion be granted.

## II. Discussion

### A. Rule 56–The Legal Standard

The defendants have moved for judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P., Rule 56.

Through summary adjudication a court is empowered to dispose of those claims that

do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and

for which a trial would be "an empty and unnecessary formality." Univac Dental Co.

v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa.

Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if

there is a sufficient evidentiary basis that would allow a reasonable fact finder to

return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes

shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec.

& Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown

that there is an absence of evidence to support the nonmoving party's claims, "the

non-moving party must rebut the motion with facts in the record and cannot rest

solely on assertions made in the pleadings, legal memoranda, or oral argument."

Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. <u>Celotex</u>, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252; <u>see</u> <u>also</u>, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be

considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n.2 (3d Cir. 2000), citing Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275, n.17 (3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. Henry v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104,

2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)." [A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, in a case such as this, where critical events at issue have been captured on videotape, the Court is obliged to consider that videotaped evidence in determining whether there is any genuine dispute as to material facts. In fact, it is clear that, in this setting, we must view the facts in the light depicted by the

videotape.  See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.")  This principle applies with particular force to inmate excessive force claims which entail videotaped encounters with staff.  Where a videotape refutes an inmate's claims that excessive force was used against her, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate.  Tindell v. Beard, 351 F.App'x 591 (3d Cir. 2009).

### B.    The Prison Litigation Reform Act's Exhaustion Requirement

The defendants first urge the Court to grant summary judgment on the plaintiff's claims because Ball failed to fully exhaust the administrative remedies available to her under Department of Corrections procedures.  In this case Ball's alleged failure to timely pursue these administrative remedies may have substantive significance for the plaintiff since the Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e's exhaustion requirement applies to a wide-range of inmate complaints, including damages complaints like those made by Ball grounded in alleged violations of the Eighth Amendment. See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000). While this exhaustion requirement is not a jurisdictional bar to litigation, this requirement is strictly enforced by the courts. This rigorous enforcement is mandated by a fundamental recognition that § 1997e's exhaustion requirement promotes important public policies. As the United States Court of Appeals for the Third Circuit has noted:

> Courts have recognized myriad policy considerations in favor of exhaustion requirements. They include (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process. Each of these policies, which Congress seems to have had in mind in enacting the PLRA, is advanced by the across-the-board, mandatory exhaustion requirement in § 1997e(a). ... [A] a comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." Moreover, "even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice" or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an

16

abusive prison guard, or creating a better screening process for hiring such guards. And when a prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages. In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring. An across-the-board exhaustion requirement also promotes judicial efficiency. . . . Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto. . . . In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained. The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures. All of these functions help courts navigate the sea of prisoner litigation in a manner that affords a fair hearing to all claims.

Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000)(citations omitted).

Because of the important policies fostered by this exhaustion requirement, it has been held that there is no futility exception to § 1997e's exhaustion requirement. Id. Instead, courts have typically required across-the-board administrative exhaustion by inmate plaintiffs who seek to pursue claims in federal court.

Moreover, courts have also imposed a procedural default component on this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004). Applying this procedural default

standard to § 1997e's exhaustion requirement, courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal court. See, e.g., Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter v. Beard, 183 F. App'x 178 (3d Cir. 2006).

Furthermore, applying this procedural default component to the exhaustion requirement, Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004), it has been held that:

> As for the failure to the identify named defendants on the grievance form, . . . to the extent the identity of a defendant was "a fact relevant to the claim," Pennsylvania's prison grievance policy mandated that the identification be included in the inmate's statement of facts on the grievance form. And, . . . in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constituted a failure to properly exhaust his administrative remedies under the PLRA.

Williams v. Pennsylvania Dep't. of Corrections, 146 F. App'x 554, 557(3d Cir. 2005).[3] Thus, "it is clear, regardless of the purpose of the requirement, that Spruill requires the prisoner-grievant-plaintiff to name in the grievance those he eventually sues, upon pain of procedural default." Hemingway v. Ellers, No. 07-1764, 2008 WL 3540526, *11 (M.D.Pa. Aug.12, 2008).

---

[3]While the Williams decision is not precedential, it is highly persuasive as a "paradigm of the legal analysis [this Court] should . . . follow." Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 n.12 (3d Cir. 1996). We find the reasoning in Williams compelling, and recommend that this reasoning be extended to the instant case.

This broad rule favoring full exhaustion admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances", Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis v. Warman, supra, 49 F. App'x at 368. See also Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and uncontradicted correctional officers impeded filing of grievance).

Furthermore, it is entirely clear that the fact that Ball has in the past been under grievance restriction pursuant to DC-ADM 804, does not, by itself, excuse her failure to grieve this matter prior to filing suit in federal court, since those Corrections policies plainly allow inmates to file a limited number of grievances. Indeed, the United States Court of Appeals for the Third Circuit has rejected this precise argument in Cummings v. Crumb, 347 F. App'x 725, 727 (3d Cir. 2009), stating in that case that:

> [The inmate] also argued that he was denied the grievance process because he was on grievance restriction. According to the Pennsylvania Department of Corrections Grievance Policy DC-ADM 804 Part IV.L, an inmate on grievance restriction is restricted to filing no more than one grievance every 15 days. *Thus, being on grievance restriction would not have prevented [an inmate] from exhausting his remedies.*

Cummings v. Crumb, 347 F. App'x 725, 727 (3d Cir. 2009)(emphasis added).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005). Nor can an inmate avoid this exhaustion requirement by merely alleging that the

Department of Corrections policies were not clearly explained to him.  Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002).  Furthermore, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust.  Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003).  Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed.  Oliver v. Moore, 145 F. App'x 731 (3d Cir. 2005)(failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

Thus, in this setting, the Prison Litigation Reform Act requires that an inmate fully exhaust her administrative remedies before proceeding into federal court, an administrative exhaustion requirement which entails full compliance with state grievance procedures and timelines, as well as the basic requisite that the inmate identify those against whom she has a grievance during the administrative process before she may name these individuals as defendants in a federal lawsuit.

## C. Ball Has Failed to Properly Exhaust Her Administrative Remedies

Judged against these guideposts, we find that the defendants are entitled to summary judgment in their favor on the grounds that Ball has failed to satisfy the PLRA's administrative exhaustion requirement. In this case, with respect to the

21

matters set forth in her complaint, it is entirely undisputed that Ball has never exhausted her administrative remedies. Ball cannot claim she was unaware of this exhaustion requirement since it is clear that Ball was fully familiar with Department of Corrections grievance procedures in August 2011, having filed numerous grievances in the past, and Ball has previously had cases dismissed due to her failure to exhaust her administrative remedies.

Furthermore, we find that Ball has failed to carry her burden of proving "that there was some extraordinary reason [s]he was prevented from complying with the statutory mandate." Davis v. Warman, supra, 49 F. App'x at 368. Ball's bald assertion in her complaint that she was unable to file and exhaust a grievance, standing alone, plainly does not carry this burden of proof. In fact, Ball's ability to file such grievances is not simply a regulatory hypothetical; in this case Ball actually filed 11 grievances and fully exhausted 3 grievances between August and October 2011. (Doc. 83, Exs. 6-8, Documentation for Grievance Nos. 378068, 378048, 379141) Therefore, it is beyond dispute that Ball had access to the grievance system throughout late August 2011. (Doc. 82, ¶¶ 21 and 22)

Moreover, the undisputed evidence shows that Ball did not fully exhaust her administrative remedies with respect to these excessive force claims arising out of this August 2011 cell extraction. Specifically, only 2 of the 11 grievances filed by

Ball in August and September 2011, were in any way relevant to the pending claim involving a cell extraction and use of OC spray on August 24, 2011. (Id., ¶¶26-28.) Both grievances were denied at the institutional level and no appeals were taken. (Id.)

Indeed, it is completely undisputed that Ball filed this lawsuit within 42 days of this incident a period of time which simply would not have permitted her to fully exhaust her administrative remedies. The physical impossibility of completing the grievance process in this short span of time is also fatal to Ball's case. It is axiomatic that, for inmates, full exhaustion is legal prerequisite to filing a federal civil rights lawsuit, and inmate-plaintiffs like Ball may not avoid this requirement by simply commencing a grievance, and then filing a lawsuit prior to completion of the grievance process. Ahmed v. Dragovich, 297 F.3d 201, 209 n. 9 (3d Cir. 2002) citing Perez v. Wis. Dep't of Corr., 182 F.3d 532, 534–35 (7th Cir.1999) (observing "Congress could have written a statute making exhaustion a precondition to judgment, but it did not. The actual statute makes exhaustion a precondition to *suit*"); Neal v. Goord, 267 F.3d 116, 122 (2d Cir.2001) (holding that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after filing her complaint in federal court). Accord Jackson v. District of Columbia, 254 F.3d 262, 269 (D.C.Cir.2001); Freeman v. Francis, 196 F.3d 641, 645 (6th

Cir.1999); Alexander v. Hawk, 159 F.3d 1321, 1328 (11th Cir.1998); Garrett v. Hawk, 127 F.3d 1263, 1265 (10th Cir.1997). Therefore, Ball's complaints about the timeliness with which prison staff attempted to address he bewildering array of grievances, do not provide her with a license to ignore of shortcut the grievance process, particularly in this case where Ball has not allowed the full grievance period to pass before she filed her lawsuit. Rather, on these facts, which are entirely undisputed, it is clear that Ball had ample opportunity to comply with the requirements of the PLRA by fully grieving these matters. Her failure to do so, therefore, compels dismissal of this case.

### D. Constitutional Standards Governing Eighth Amendment Claims

In conducting this legal analysis we must also be mindful of the constitutional standards which govern Eighth Amendment claims, since Ball advances an Eighth Amendment claim against the remaining defendants in his complaint alleging, with varying degrees of clarity, that prison staff violated her Eighth Amendment rights by using excessive force against her. This Eighth Amendment claim is judged against settled legal principles, principles which set precise and exacting standards for asserting a constitutional infraction, but are governed by the same overarching and animating constitutional benchmarks. As the United States Court of Appeals for the Third Circuit has observed:

The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.

Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298, 111 S.Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000)

With these tenets in mind we turn to a consideration of the Eighth Amendment claims advanced here by Ball. At the outset, Eighth Amendment excessive force claims entail a showing of some subjective intent to injure. In an excessive force case, where "prison officials stand accused of using excessive physical force in

25

violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley[v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim often entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322). There are several factors that a court examines in determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible

officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" Id. at 106.

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-7 (1989). Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that [s]he caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

Furthermore, in assessing such claims in a case where an encounter is captured on videotape we are mindful of the fact that when "videotape refutes [an inmate's] assertion that defendant[s] used excessive force," or when the "video shows that [an inmate] did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," we should conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view

the video of the incident and determine that [defendants] acted maliciously and sadistically," and may enter summary judgment on an excessive force claim. <u>Tindell v. Beard</u>, 351 F. App'x 591, 596 (3d Cir. 2009).

In addition, in the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, government officials are entitled to qualified immunity as a matter of law. <u>Gilles v. Davis</u>, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, the test for qualified immunity can be simply stated: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " <u>Id.</u>

Finally, courts have consistently found that an isolated discrete use of pepper spray does not state an Eighth Amendment claim. <u>See, e,.g.</u>, <u>Luciano v. Lindberg</u>, 1:CV-09-01362, 2012 WL 1642466 (M.D. Pa. May 10, 2012) <u>Picozzi v. Haulderman</u>, Civ. No. 4:08–CV–0926, 2011 WL 830331, at *5 (M.D.Pa. Mar. 3, 2011) (plaintiff failed to establish an excessive use of force claim where record establishes that the force used, pepper spray, was necessary and the minimum amount needed to get the plaintiff to an area where she could be medically treated);

Soto v. Dickey, 744 F.2d 1260, 1270 (4th Cir.1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment," even if the inmate is handcuffed).

### E. The Defendants Are Entitled to Summary Judgment

#### 1. Ball's Excessive Force Claims Fail

Guided by these benchmarks, we conclude that the defendants are entitled to summary judgment in this case on Ball's Eighth Amendment excessive force claims since the immutable witnesses, the videotape evidence, plainly "refutes [Ball]'s assertion that defendant[s] used excessive force," and we conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically." Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).

The evidence regarding this use-of-force incident, which forms the basis for the plaintiff's excessive force claim, simply does not support the plaintiff's claims. Rather, the evidence reveals that the plaintiff's recalcitrant actions inspired the need to use force. The evidence further shows that this use-of-force incident was modest in scope, duration and intensity, as the responding officers did little more than administer a single short burst of OC spray in order to gain control of the plaintiff.

The evidence also shows that the plaintiff was seen by medical staff after this incident, and was found not to have suffered any injuries resulting from this use of force.

It is clear that this limited action by corrections staff, standing alone, does not state a constitutional claim since courts have consistently found that an isolated discrete use of pepper spray does not state an Eighth Amendment claim. See, e,.g., Luciano v. Lindberg, 1:CV-09-01362, 2012 WL 1642466 (M.D. Pa. May 10, 2012) Picozzi v. Haulderman, Civ. No. 4:08–CV–0926, 2011 WL 830331, at *5 (M.D.Pa. Mar. 3, 2011) (plaintiff failed to establish an excessive use of force claim where record establishes that the force used, pepper spray, was necessary and the minimum amount needed to get the plaintiff to an area where she could be medically treated); Soto v. Dickey, 744 F.2d 1260, 1270 (4th Cir.1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment," even if the inmate is handcuffed).

Indeed, with respect to Ball's excessive force claims, there is nothing in the videotape depiction of this episode that could even remotely be characterized as in any way malicious or sadistic, the essential prerequisite to an Eighth Amendment violation. Quite the contrary, the video is striking and notable for the restraint exhibited by correctional staff, and for the care and attention which they give to Ball

in the face of constant provocation by the plaintiff. We must view the facts in the

light depicted by the videotape, and may not indulge in the"visible fiction" that

Ball's version of events, which is plainly contradicted by the video, creates a

genuine and disputed issue of fact. See Scott v. Harris, 550 U.S. 372, 380-81 (2007)

(reversing court of appeals ruling with respect to application of qualified immunity

in an excessive force case, noting that the court of appeals erred by accepting a

version of facts that was shown to be a "visible fiction" and admonishing that the

lower court "should have viewed the facts in the light depicted by the videotape.")

Viewing these events through this analytical prism, and having carefully observed

this videotape, it is simply impossible to say that any " reasonable finder of fact

could view the video of the incident and determine that [defendants] acted

maliciously and sadistically."  Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir.

2009). Therefore, summary judgment is appropriate here on behalf of all defendants

as to this claim.[4]

---

[4]Ball's claim against Captain Karchner with respect to this August 24, 2011 incident is similarly unavailing since the undisputed evidence shows that Karchner was not on duty that day and played no role in these events. (Doc. 111, ¶53) This was a fatal shortcoming with respect to Ball's claims against this defendant who only "can be liable if they 'participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations.' A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir.2004) (second alteration in original)." Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir. 2010). Since defendant Karchner was not even present on August 24, 2011, it follows that he cannot have participated, directed or acquiesced in this activity, and he should be

## 2.    **Qualified Immunity**

But even if Ball had stated a colorable constitutional claim, the defendants would still be entitled to qualified immunity from these claims for damages.  In order to establish a civil rights claim Ball must show the deprivation of a right secured by the United States Constitution or the laws of the United States.  Satisfying these elements alone, however, does not guarantee that Ball is entitled to recover damages from these public officials.   Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009).   This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit."  Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

---

dismissed as a defendant.

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question

has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on

summary judgment. <u>See</u> <u>Montanez v. Thompson</u>, 603 F.3d 243 (3d Cir. 2010).

In the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, or the use of OC spray, courts have acknowledged that, in certain instances, summary judgment is entirely appropriate. <u>Gilles v. Davis</u>, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, courts agree that: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " <u>Gilles v. Davis</u>, 427 F.3d 197, 207 (3d Cir. 2005). Courts have also consistently found that an isolated discrete use of OC spray does not state an Eighth Amendment claim. <u>See, e,.g.</u>, <u>Luciano v. Lindberg</u>, 1:CV-09-01362, 2012 WL 1642466 (M.D. Pa. May 10, 2012) <u>Picozzi v. Haulderman</u>, Civ. No. 4:08–CV–0926, 2011 WL 830331, at *5 (M.D.Pa. Mar. 3, 2011) (plaintiff failed to establish an excessive use of force claim where record establishes that the force used, pepper spray, was necessary and the minimum amount needed to get the plaintiff to an area where she could be medically treated); <u>Soto v. Dickey</u>, 744 F.2d 1260, 1270 (4th Cir.1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment," even if the inmate is handcuffed).

Applying these benchmarks, and viewing the actions of correctional staff in the light depicted by the videotapes, we find that the defendants are entitled to qualified immunity in this case. The only force applied in this case was a single use of OC spray. That use of OC spray in this case was specifically authorized by Ball's treating physician, and was conducted in a fashion identical to other past uses which have been approved by the courts. Thus, nothing in the measured and restrained conduct depicted in the videos could have alerted these officials that their actions violated "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Therefore, these officials should be entitled to qualified immunity from damages in this case.

## III.    Recommendation

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' motion for summary judgment (Doc. 109) be GRANTED, and Ball's motion to deny summary judgment, (Doc. 141), be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing

requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 9th day of December, 2013.

*__S/Martin C. Carlson__*
Martin C. Carlson
United States Magistrate Judge